1

2                           **UNITED STATES DISTRICT COURT**

3                                **DISTRICT OF NEVADA**

4                                        * * *

5    UNITED STATES OF AMERICA,              )
                                            )
6                         Plaintiff,        )
                                            )        2:12-cr-00270-APG-VCF-1
7    v.                                     )
                                            )        MOTION TO SUPPRESS (#48)
8    CHARLES PECCHIO,                       )
                                            )
9                         Defendant.        )
10   _____ )

11                          **REPORT & RECOMMENDATION**

12           Before the court is defendant Charles Pecchio's Motion to Suppress.  (#48).  The government

13   filed an Opposition (#49), and defendant did not file a Reply.  The court held a hearing on May 16,

14   2013.  (#68).

15           Defendant Pecchio is awaiting trial on charges of conspiracy to commit wire fraud, in violation

16   of 18 U.S.C. § 1349.  (#1).  Defendant seeks an order suppressing all evidence obtained as a result of

17   the interception of wire communications authorized by the Honorable Judge Hunt.  (#48).  In his

18   motion, Pecchio asserts that the wire interceptions were issued without a showing of necessity as

19   required by 18 U.S.C. § 2518(c) and that Judge Hunt did not have a foundation upon which to base his

20   finding of probable cause.  (#48).

21                                  **BACKGROUND**

22           Defendant Pecchio was allegedly involved in a large-scale, unlicensed race book operation.

23   (#1).  In the fall of 2006, the Nevada Gaming Control Board (NGCB) and ICE Agents from the Money

24   Laundering and Asset Removal (MLAR) task force began an investigation into allegations that Michael

25   Jelinsky, Jeffrey Jelinsky, and others ("Jelinsky Group") conspired to conduct an illegal gambling

26   business and money laundering in Las Vegas, NV.   (#49).  The Jelinsky group was believed to be

accepting wagers on horse races from bettors outside the state of Nevada.  (#48 Exhibit 2 Affidavit in Support of Application, ¶ 28).

It is alleged that the Jelinsky Group employed "writers" or "phone men" to accept wages from bettors.  *Id.*  "A writer or phone man is a person employed by a race book to relay racing line information to and to accept telephone wagers from bettors."  *Id.*  ICE Special Agent Laura Hodgdon suspected that the defendant Pecchio was employed as a writer or phone man for the Jelinsky group's race book operation.  *Id.*

The NGCB received two anonymous letters regarding the Jelinsky Group's operations.  *Id* at 51.  On or around November 2, 2006, NGCB received the second letter which stated that Michael Jelinsky was paying off the Palms' race book supervisors, which allowed him to make illegal bets.  *Id.*  The letter went on to allege that, "when Michael Jelinsky bets on a race where a field is scratched down to five, the sports book supervisor pays him if he wins and refunds his money if he loses."  *Id.*

On numerous occasions, from September 2006 to June 2007, agents observed defendant Pecchio with other members of the Jelinsky Group at the Palms Casino's sports book.  *Id.*  On September 25, 2006, NGCB agents observed the defendant talking on his cell phone as he left the Palms' sports book toward the casino's public payphones.  *Id.* at ¶ 45.  The NGCB agent then observed  defendant Pecchio dial the number for Youbet/IRG[1] on the public payphone.  *Id.*  That same day, the agents also observed the defendant speaking with the Race and Sports book Supervisor, Michael Albanese. *Id* at ¶ 46.  Mr. Albanese was observed giving his car keys to defendant Pecchio. *Id.*

The agents observed defendant Pecchio at the Palms' sports book with the Jelinsky Group on October 10, 2006 (¶ 48), December 13, 2006 (¶ 52), December 14, 2006 (¶ 56), February 26, 2007 (¶ 72), February 27, 2007 (¶ 73), March 12, 2007 (¶ 74), March 20, 2007 (¶ 77), April 19, 2007 (¶ 79), June 1, 2007 (¶ 83).  *Id.* On many of these occasions, the defendant was observed leaving the sports book to place calls on either his cell phone or the casino payphone, and then returning to place wagers.

---

[1]Youbet.com is the parent corporation of the International Racing Group ("IRG"), which allegedly accepted illegal bets from the Jelinsky Group.  *Id.* at ¶ 29.  *See also Id.* at  ¶ ¶ 33-36.

*Id.*

On February 27, 2007, agents overheard defendant Pecchio on his cellular phone say, "8 is 8-5" and "Kenny I don't know, I'm not looking at it, $5 and 3.40." *Id* at ¶ 73. About ten minutes later, Agents overheard Charles Pecchio on his cellular say "no good, 192, what do you want me to do?" *Id.* Agents later overheard Charles Pecchio on his cellular say "8 is 2-1, he doesn't like the 8 at all." *Id.*

On June 18, 2007, Assistant United States Attorney Eric Johnson submitted an Application for an Order Authorizing the Interception of Wire Communications over specified telephones known to be used by the Jelinskys and their conspirators. (#48-1). The application included ICE Special Agent Laura Hodgdon's affidavit in support. (#48 Exhibit 2 Affidavit in Support of Application). The affidavit describes the facts stated above in more detail. *Id.*

The affidavit also includes a summary of the unavailability of alternative investigative techniques, which necessitated the order authorizing the interception of wire communication. *Id.* at ¶ 28. Agent Hodgdon listed the following explanations of how alternative investigative techniques had been tried without success, reasonably appear unlikely to succeed if continued, reasonably appear to be unlikely to succeed if tried, or too dangerous to employ:

- **Confidential Source**

The confidential source ("CS-1"), is not privy to the full scope of the illegal activities. *Id.* at ¶ 124(a). The affiant, Agent Hodgdon, believed that suspicions would arise if CS-1 attempted to learn new information due to his limited relationship with Michael and Jeffrey Jelinsky. *Id.* CS-1 also refused to wear a recording device or testify against the subjects out of fear of his/her own safety. *Id.*

- **Cooperation from members of the Jelinsky Group**

Agent Hodgdon did not believe that any of the subjects of the investigation would be motivated to cooperate with law enforcement. *Id.* at ¶ 124(b). The agent reasoned that the members of the Jelinsky Group appeared to derive their livelihood from the operation, and approaching any of the members would place the investigation in jeopardy. *Id.*

- **Undercover Agents**

The affiant believed that the opportunity to introduce an undercover agent would be extremely unlikely because the of the close-knit nature of the subjects. *Id.* at ¶ 124(c). She also believed that it could interfere with the covert nature of the operation and be dangerous for the undercover agent. *Id.*

3

- **Physical Surveillance**

Agent Hodgdon stated that the physical surveillance was useful in placing individuals together, but provided "little information regarding the purpose of their meetings and the content of their conversations." *Id.* at ¶ 124(d). Also, the subjects were "extremely surveillance-conscious," evidenced by "the manner in which the subject[s] have continued to change phone numbers, open[ed] prepaid cellular phone accounts and open[ed] cellular accounts under their mother's name." *Id.* The agent believed that "the information gained by electronic surveillance would assist in establishing the roles of each individual, the nature of the activities, the location of physical evidence and the like." *Id.*

- **Federal Grand Jury Subpoenas**

The affiant believed that the Federal Grand Jury subpoenas would not be successful because if called to testify the subjects would likely invoke their Fifth Amendment privileges and refuse to testify. *Id.* at ¶ 124(e). She believed that the operation would temporarily cease and evidence may be destroyed if Grand Jury subpoenas were issued. *Id.*

- **Search Warrants**

Agent Hodgdon believed that the issuance of search warrants during that stage was premature because the investigating agents did not know with certainty where the subjects conducted their meeting and directed their gambling activities. *Id.* at ¶ 124(f). Up to that point, the agents were unable to determine how and where the subjects kept records of their bookmaking operation. *Id.* Agent Hodgdon feared that if search warrants were executed before identifying the location of the records the agents would run the risk of missing critical documents. *Id.* Also, she believed that the execution of search warrants would alert the subjects to the existence of an investigation and cause them to alter their routines and destroy evidence. *Id.*

- **Interviews**

Agent Hodgdon, based upon her experience, believed that any interview conducted with the subjects would not be successful. *Id.* at ¶ 124(g). "In addition, any attempt to interview the subjects would necessarily terminate any further investigation of ongoing criminal activity before the full scope of those activities has been determined and all the conspirators identified." *Id.*

- **Trash Covers**

The agents have obtained limited results from trash covers conducted in connection with this investigation. *Id.* at ¶ 124(h). Agents were successful at collecting and analyzing trash from the Palms Casino, but attempts to collect trash from Jeffrey Jelinksky's residence failed. *Id.* The agents believed that even if their attempts were successful, "the results would not likely identify known conspiracy members or fully identify the nature and extent of the illegal activities of the Subjects." *Id.*

- **Toll Records and Pen Registers**

The investigation included toll record analysis and the use of pen registers. *Id.* at ¶

4

124(d). These techniques have revealed the number of calls made, the duration, and the phone number dialed on an outgoing call, however, they cannot reveal the participants and topics discussed. *Id.* Agent Hodgdon believed that continued use of these techniques could further substantiate the use of the telephone in a criminal enterprise, but not in determining the identities of the members in the enterprise or the extent of their involvement. *Id.*

On June 18, 2007, Judge Hunt entered an Order Authorizing the Interception of Wire Communications, finding that "[i]t has been adequately established that normal investigative procedures have been tried and have failed, reasonably appear unlikely to succeed if continued, reasonably appear unlikely to succeed if tried, or are too dangerous to employ." (#49-1). Judge Hunt also made similar findings in his subsequent Order Authorizing the Continued Interception of Wire and Electronic Communication entered on July 18, 2007. (#49-2).

On July 24, 2012, a Federal Grand Jury returned an indictment charging Michael Albanese, Matthew Kidle, Kassie Baker (hereinafter "Palms Employees Defendants"), and defendant Pecchio with one count of Conspiracy to Commit Wire Fraud, in violation of Title 18, United States Code, Section 1349 and a one count Forfeiture Allegation. (#1). The indictment alleges that the Palms Employee Defendants conspired with one another, with defendant Pecchio, and with others known and unknown, to execute a scheme to defraud the Palms Casino. *Id.* It further alleges that, "the conspirators combined to fraudulently place, accept and honor invalid quinella[2] wagers at the Palms Casino's sports and race book." *Id.*

The indictment alleges that Palms Employee Defendants knowingly accepted invalid quinella wagers from defendant Pecchio and others on fewer than six horses. *Id.* It further alleges that the Palms

---

[2] According to the indictment, "[a] quinella wager is a type of a wager that may be placed on a horse race. A quinella wager is a type of bet in which the bettor picks the first and second place finishers without specifying their order. If the two selected horses finish the race first and second, the bettor wins the wager. There are also variations of quinella wagers referred to as "quinella box" and "quinella wheel" that permits a bettor to place a wager that any combination of three (or more) horses will finish first and second." (#1).

"The number of horses in a race is material to the odds of a quinella wager. As a matter of probability, a bettor's statistical chances of picking a winning quinella combination are inversely related to the number of horse in a race. The probability of picking a winning quinella combination increases if horses withdraw or are "scratched" from a race. At all times material to this indictment, the Palms' Casino established policies to forbid quinella wagers on races involving fewer than six horses. If horses withdrew or "scratched" reducing the field to fewer than six horses in a race, any previously placed wagers were to be cancelled and refunded to the bettors." *Id.*

Employee Defendants honored fraudulently placed wagers; for example, if the conspirator picked a winning combination from a diminished field. *Id.* Also, when the conspirators did not win a quinella wager despite the improved odds, the indictment alleges that the Palms Employee Defendants would retroactively cancel the wager and issue a refund to the coconspirator who placed the bet. *Id.* The indictment alleges that the conspirators defrauded the Palms Casino of more than eight hundred thousand dollars ($800,000). *Id.*

An arrest warrant was issued for defendant Pecchio on July 24, 2012. (#8). Defendant Pecchio was arrested in Newark, New Jersey on October 10, 2012. (#39). On October 11, 2012, defendant Pecchio made his initial appearance in the District of New Jersey and was released on a $100,000 unsecured bond. (#38). On October 19, 2012, defendant Pecchio made his initial appearance before Magistrate Judge Ferenbach. (#43). A CJA Panel Attorney was appointed and the defendant pled not guilty. *Id.* This instant Motion to Suppress Wiretap Evidence was filed on November 19, 2012. (# 48). The Response to Motion to Suppress Wiretap Evidence was filed on December 5, 2012. (#49). On December 12, 2012, the court set an evidentiary[3] hearing on Defendant's Motion to Suppress Wiretap Evidence (#48) for February 4, 2013. (#50). The Reply in support of the Motion to Suppress Wiretap was due on January 16, 2013. (#52). No Reply has been filed. On January 23, 2013, the parties stipulated to vacate the evidentiary hearing set for February 4, 2013 and continue the evidentiary hearing for 45 days. (#53). On January 25, 2013, the court issued an order granting the stipulation (#53) and continuing the evidentiary hearing to March 18, 2013, at 10:00 a.m. (#55).

On March 12, 2013, the parties filed a stipulation to continue the evidentiary hearing. (#60). The court signed the stipulation (#60) on the same day, and continued the hearing to May 16, 2013.

---

[3] The minute order stated "that an *evidentiary* hearing on Defendant's Motion to Suppress Wiretap Related Evidence (#48) is scheduled for February 4, 2013 at 10:30 a.m. in Courtroom 3D. The U.S. Marshals will transport Defendant Pecchio to the Court for the *evidentiary* hearing." (#50)(emphasis added). During the evidentiary hearing, defense counsel stated that he did not know that the hearing was an *evidentiary* hearing. (#68). The court notes that the minute order scheduling the hearing (#50) was sent to defense counsel at the following email addresses: rasmussenlaw@gmail.com, chris@rasmussenkang.com, elenarasmussen@rocketmail.com, mmaston@cox.net, rasmussenkang@gmail.com.

(#61).  On March 13, 2013, the court issued an order setting calendar call for March 27, 2013.  (#62).
On March 19, 2013, the parties filed a stipulation to continue the trial (#65), which the court signed on
March 21, 2013 (#66), continuing the trial to August 8, 2013.  The court held a hearing on the motion
to suppress (#48) on May 16, 2013.  (#68).  No witnesses were called to testify.

## DISCUSSION

**Motion To Suppress (#48):**

In the present motion to suppress, defendant Pecchio asserts that the wire interceptions were
issued without a showing of necessity as required by 18 U.S.C. § 2518(c).  (#48).  Pecchio further
asserts that the applications fail in two respects: (a) the affidavits supporting the applications do not
establish that normal investigative procedures had been tried and had failed or reasonably appeared to
be unlikely to succeed if tried or to be too dangerous if tried; and (b) the affidavits lacked foundation,
and the affiant's opinions regarding the meaning of the "coded" language should not have been
considered by the court in determining whether the interception of wire communication should have
been approved.  *Id.*  Defendant also asserts that Judge Hunt erred in finding that probable cause existed
to authorize the wiretaps.  *Id.*

Defendant Pecchio asks the court to suppress the following evidence:

(1)     All telephone conversations recorded pursuant to the Applications for the
        Interception of Wire Communications, and all subsequent Applications for
        Continued Interception of Wire Communications.

(2)     All telephone conversations intercepted and recorded by the government
        in relation to Target Telephones 1-3, and that contain the Defendant's
        voice or mention, pertain or relate to the Defendant.

(3)     The contents of all intercepted wire communications to which the
        Defendant was a party.

(4)     All telephone conversations intercepted and recorded by the government
        in relation to Target Telephones Numbered 1-3, on the grounds that the

government is in violation of the Title 18 of the United States Code and the United States Constitution, Due Process and the Fourth Amendment of the United States.  *Id.*

## I.      Standard of Review

"The judge authorizing a wiretap has considerable discretion." *United States v. Brone*, 792 F.2d 1504, 1506 (9th Cir.1986); see e.g., *United States v. Smith,* 519 F.2d 516, 518 (9th Cir. 1975). ("considerable discretion rests with the judge to whom the application for permission to wire tap is made"). "Accordingly, the standard of review of the decision on appeal is deferential." *Brone*, 792 F.2d at 1506.  Although we review de novo whether the application for wiretapping was submitted in compliance with 18 U.S.C. § 2518(1)(c), we review the issuing court's decision that the wiretaps were necessary for an abuse of discretion. *Brone*, 792 F.2d at 1506.  *United States v. McGuire*, 307 F.3d 1192, 1197 (9th Cir. 2002); accord *United States v. Forrester*, 616 F.3d 929, 934 (9th Cir. 2010); *Garcia-Villalba,* 585 F.3d at 1227; *United States v. Lynch*, 437 F.3d 902, 912 (9th Cir. 2006).

## II.     Wiretap

### A.      Necessity Requirement

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, 82 Stat. 212 (codified at 18 U.S.C. § 2510 et seq.) allows judicially authorized interception of wire, oral, and electronic communications if the judge finds, among other things, that "(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous..."  18 U.S.C. § 2518(3)(c).

The procedural steps set forth in the statute require "strict adherence," and "utmost scrutiny must be exercised to determine whether wiretap orders conform to Title III."  *U.S. v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001) (citing *United States v. Giordano*, 416 U.S. 505 (1974) (internal quotations omitted).  The provision at issue here is §2518(1)(c), known as the "necessity requirement."   The necessity requirement "'exists in order to limit the use of wiretaps, which are highly intrusive.'"  *Id.* (citing *United States v. Bennet*, 219 F.3d 1117, 1121 (9th Cir 2000) (quoting *United States v. Commito*,

918 F.2d 95, 98 (9th Cir. 1990))).   The statute also requires that the issuing judge determine whether the wiretap application contains facts that support "normative investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. §2518(3)(c).   "The purpose of these requirements is to ensure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *Blackmon*, 273 F.3d at 1207 (citing *United States v. Kahn*, 415 U.S. 143, 153 (1974)).

The Ninth Circuit requires a full and complete statement of "specific allegations indicating why normal investigative procedures failed or would fail in the particular case." *Id.* (citing *United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir. 1985)).   Along with the "specificity requirement", the Ninth Circuit also requires a "common sense approach" in which "the reviewing court uses a standard of reasonableness to evaluate the government's good faith effort to use alternative investigative means or its failure to do so because of a danger or low probability of success." *Id.*   When assessing the application for an adequate showing of necessity, the suppression court must examine the application to see "whether it contains material misstatements or omissions regarding necessity." *Id.*   If material misstatements or omissions are found, the court must "determine the facts relying on credible evidence produced at the suppression hearing to  determine whether 'a reasonable [issuing] judge could have denied the application because necessity for the wiretap had not been shown.'" *Id.* (citing *Ippolito*, 774 F.2d at 1486-87).

With these concepts in mind, the court will address each of the parties' arguments relating to necessity and its rulings below.

### 1. Full and Complete Statement
#### a. Defendant's Argument

Defendant Pecchio asserts that "[t]o be in compliance with Title III, a wiretap application must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."

(#48) (citing 18 U.S.C. Section 2518(1)(c).  Defendant also asserts that normal investigative procedures "'would include, for example, standard visual or aural surveillance techniques by law enforcement officers, general questioning or interrogation under an immunity grant, use of regular search warrants, and the infiltration of conspiratorial groups by undercover agents or informants.'"  *Id.* (quoting Senate Comm. On the Judiciary, report on the Omnibus Crime Control and Safe Streets Act of 1967, S.Rep. No. 1097 at 101 (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2190).  The defendant also argues that any communication intercepted pursuant to an application with an inadequate statement must be suppressed.  *Id.* (citing 18 U.S.C. Section 2518(10)(a); *see also, United States v. Santora*, 600 F.2d 1317, 1322-23 (9th Cir. 1979)).

Defendant Pecchio argues that the wiretap in this case was unnecessary because the "lengthy affidavit is chalked full of specific details" from the confidential source, while also arguing that the affidavit is insufficient because the affidavit did not contain a full and complete statement as required by 2518(1)(c).  *Id.*  The defendant asserts that he "will demonstrate that, in fact, little to no investigation was done of the targets before the authorization was sought to tap the target telephones," and that since "[t]raditional methods of investigation have not been attempted, the government must show that 'under the particular circumstances of the case the employment of such techniques reasonably appear[ed] to be unlikely to succeed if tried or to be too dangerous.'"  *Id.* (quoting *United States v. Spagnuolo*, 549 F.2d 704, 710 (9th Cir. 1977)).

**b. Government's Argument**

The government argues that the supporting affidavit includes a full and complete statement as to the use and efficacy of other investigative procedures in compliance with 18 U.S.C. § 2518(1)(c). (#49).  In support of its argument, the government quotes Magistrate Leen's observation: "An affidavit contains a full and complete statement of facts in compliance with § 2518(1)(c) if it attests that adequate investigative techniques were exhausted before the wiretap order was sought or that such methods reasonably appeared unlikely to succeed or were too dangerous."  *Id.* (quoting *United States v. Taskov*,

1   2:10–cr–00217–PMP–PAL, 2011 WL 2847536 (D.Nev. 2011) (Findings and Recommendations of

2   Magistrate Judge P. Leen)).

3       The government asserts that Special Agent Hodgdon outlined the efforts of a 9-month

4   investigation in "case-specific detail" and that the "investigative techniques had been used and why they

5   were ultimately of limited utility, and those which had not been used and why they would be ineffective

6   or dangerous." *Id.* Agent Hodgdon also explained "how the use of a confidential informant, physical

7   surveillance, grand jury subpoenas for records and documents, and pen registers and telephone toll

8   analysis had proven inadequate." *Id.* (See *Garcia-Villalba*, 585 F.3d at 1228 ("the government's

9   extensive use of other forms of electronic surveillance prior to seeking a wiretap weighs heavily in its

10  favor.")).

11

12                                          **c. Discussion**

13      The court finds that the affidavits submitted by Agent Hodgdon (#48-2 and #48-3) contain full

14  and complete statements "as to whether or not other investigative procedures have been tried and failed

15  or why they appear to be unlikely to succeed if tried or to be too dangerous" as required by 18 U.S.C.

16  2518(1)(c). As the Ninth Circuit held in *United States v. McQuire*, 307 F.3d 1192, 1196—97 (9th Cir.

17  2002), while "the wiretap should not ordinarily be the initial step in the investigation,…law enforcement

18  officials need not exhaust every conceivable alternative before obtaining a wiretap."

19

20      Agent Hodgdon's original affidavit is seventy-seven (77) pages in length and her affidavit

21  supporting the continued interception is fifty-two (52) pages in length, containing  detailed summaries

22  of the investigation, other investigative procedures used, and a list of those investigative procedures that

23  would be unsuccessful and why.  (#48-2 and #48-3)[4].  The court will first address the investigative

24  procedures used by the agents and why they were not sufficient, and then address the unavailability of

25  alternative investigative techniques.

26  ―――――――――――――――――――――――――――――――――――――――――――――――――――――
        [4] The "affidavit" in this section refers to both the original affidavit (#48-2) and the affidavit supporting the
    continuing interception (#48-3).

The first affidavit demonstrates that pen registers and trap and trace devices were authorized for cellular phones used by Michael Jelinsky, where the number was changed several times and then cancelled, registered to Barbara Jelinsky but used by Michael Jelinsky, and used by Jeffrey Jelinsky (#48-2 at Pages 53-68), and the second demonstrates that pen registers and trap-and-trace devices were authorized for a phone used by Masesso (#48-2 at Pages 25-27).  Agent Hodgdon describes in detail the amount of incoming and outgoing phone calls, the numerous telephone number changes, the registering of phone numbers to the Jelinsky brothers' mother, the unusually short length of the conversations, and the fact that the activity of certain phone numbers would significantly drop, and states that this activity is indicative of trying to avoid surveillance and of bookmaking activity.  (#48-2 at Page 55 and #48-3 at Pages 25-27).

Toll records revealed that calls were often made to Youbet.com, but the agents were unable to hear the content of the conversations.  *Id.*  Agent Hodgdon states that the analysis of telephone toll records and the use of pen register devices have been (1) "adequate in substantiating that a number of calls have taken place," (2) helpful "in determining the duration of the calls" and to what number the call was placed, and (3) useful "to further substantiate the use of the telephone in…the criminal enterprise by showing the volume and duration of the calls."  (#48-2 at Page 73 and #48-3 at Page 40). Agent Hodgdon asserts that the techniques, however, "cannot reveal the participants or the topics discussed, or assist "in determining the identities of the members of the enterprise or the extent to which they are involved." *Id; See Garcia-Villalba*, 585 F.3d at 1228 (recognizing that the use of pen registers and trap-and-trace methods were not sufficient investigative procedures in the circumstances because, although the numbers called were traced, the "subject-matter of those conversations" were not revealed).

The affidavit contains numerous accounts of physical surveillance of the subjects interacting in the sports book, exchanging money and/or race forms, walking outside to place phone calls either on their cell phones or on the public payphones, reading information off of race forms to persons on the

phone, writing information down, and returning to place bets.  *See generally Id.*  The agents observed one suspect leaving an illegal wire room in Las Vegas, Nevada, and followed him to the Orleans Casino, where he met Jeffrey Kelinsky in the race book.  *Id* at Pages 23-24.  On another occasion, the subjects were seen leaving the Palms Casino together and followed to the Poker Palace where they entered the casino's race book.  *Id* at Page 36.  The subjects were often seen at the Poker Palace's race book.  *Id.*

Agent Hodgdon states that the physical surveillance was useful in placing the individuals together, but provided little information regarding the "purpose of their meetings and the content of their conversations."  *Id* at Page 69.  Agents were only able to overhear a couple of one-sided telephone conversations involving subjects, where the subject would provide numbers such as "8-1, 3-1, 5-10," and ask the person on the other end what they wanted to do.  *Id* at Page 35.  The second affidavit states that the use of physical surveillance (1) was useful in placing the individuals together, but provided little information regarding the "purpose of their meetings and the content of their conversations" (page 36), Jeffrey Jelinsky drives erratically making it difficult to maintain effective surveillance (page 36), and that the interception of wire communications have helped and will continue to help the agents establish when a meeting will take place and set up physical surveillance in advance, thereby minimizing the risk of discovery inherent in following or remaining in the vicinity too long (page 36).  (#48-3).

Agent Hodgdon states that the physical surveillance has provided only limited evidence and has been "met with only limited success because the [s]ubjects are extremely surveillance conscious."  *Id* at Page 69; *Garcia-Villalba,* 585 F.3d at 1228 (holding that since the affidavit stated the subjects' "countersurveillance techniques…successfully frustrated" physical surveillance efforts, the affidavit explained in sufficient detail why the surveillance efforts were unsuccessful.").  The "surveillance conscious[ness]" is demonstrated by the fact the Jeffrey Jelinsky told FBI that he received an anonymous letter about being investigated by the FBI, which would raise the suspicion level, and the

manner in which the subjects changed phone numbers and opened prepaid cellular accounts.  *Id* at Page 69-70.

Agent Hodgdon also states that the physical surveillance helped establish the main targets of the operation, but not the roles of the individuals, something that a wiretap could accomplish without fear of discovery.  *Id* at Page 70.  The agent asserts that the wiretap could also provide the agents with knowledge of the location of physical evidence and/or the location of a meeting, without the risk of discovery inherent in following the subjects or remaining in the vicinity for too long.  *Id.*

The agents were also given permission by the Palms Casino to search the hotel room of two of the subjects after they checked out, and the first search revealed "an empty prescription bottle with Michael Jelinsky's name on the label," a "stack of race forms, two editions of the Daily Racing Form newspaper, handwritten notes showing wagering information and a handwritten note with the numbers $10,570.28," and the second search revealed race book tickets, documents containing information on the horses running each day, several race forms from the Palms with handwritten notes, and a scratch paper containing a checking account and routing number for a Bank of America account held by Michael Jelinsky. *Id* at Pages 22-23, and 25.  The affidavit explains, as discussed below, how obtaining search warrants and conducting more searches "would not likely identify unknown conspiracy members or fully identify the nature and extent of the illegal activities of the Subjects."  (#48-2 at Page 72 and #48-3 at Page 38).

The affidavit indicates that Agent Shields received an unsolicited phone call from Albert Moller regarding Jeffrey Jelinsky's suspicion that the FBI was investigating him, which led to Agent Shields, Moller, and Jelinksy conducting a monitored and recorded meeting.  *Id* at Page 29-30.  During the meeting, Jelinsky admitted that he messed up his bank account by making transactions right under the $10,000 reporting requirement, and that as a professional gambler, he took some bets for friends in New York, which he described as "completely legal."  *Id*  at Page 31.  The government's use of "other forms

of electronic surveillance prior to seeking the wiretap weighs heavily in its favor." *Garcia-Villalba*, 585 F.3d at 1228.

Agent Hodgdon states that, although Jeffrey Jelinsky solicited a meeting with the FBI, the information he provided the FBI was "very limited and was not sufficient to meet all the objectives of this investigation," and that a second meeting would not elicit critical information and would only alert Jelinsky to the investigation and result in him changing the way he conducts business.  (#48-2 Page 73). Agent Hodgdon also states that initiating interviews with other subjects would "necessarily terminate any further investigation of ongoing criminal activity before the full scope of those activities has been determined and the conspirators identified."  *Id* at 72; *See Garcia-Villalba*, 585 F.3d at 1229 (finding adequate an affidavit that explained that interviews of subjects would "effectively terminate the investigation without achieving the objective of identifying and obtaining evidence against, other participants.").

The agents conducted trash covers from two residences, which revealed a T-Mobil bill for the phone number provided by Moller, an envelope from Stations Casino, a brochure from www.betCRIS.com, an internet wagering site, a Harness Eye race newspaper with hand written notes containing a Bank of America account number and a telephone number, a Gaming Today newspaper, part of a Daily Racing Form newspaper with handwritten notes on it, race tickets from the Orleans Casino, torn race tickets from the Palms Casino, and a T-Mobile To Go card for $50.00.  (#48-2 Page 32 and #48-3 at Page 39).

The agents also recovered trash from the back row of the race book at the Palms Casino after the Jelinsky Group had been sitting there and left for the day, including a stack of Palms Casino race tickets, a stack of Len Ragozin race forms with hand written notes regarding wagering for each track, a stack of Palms Casino race forms with wagering information and account balances written on them, and  a race form with a New York telephone number on it that was called 42 times from one of the target phones from February 23, 2007, and March 23, 2007.   (#48-2 at Pages 32 and 33).  The agents were

1   unable to conduct trash covers of Masesso's trash because he lives in a high-rise condominium.  (#48-3

2   at Page 39).

3

4        Agent Hodgdon states that the trash covers "have produced limited results," and that although

    the agents had "some success in pulling trash collected from the Palms Casino, attempts to pull from

5   the target residences has been, for the most part, unsuccessful."  (#48-2 at Page 73 and #48-3 at 39-40).

6   The agent also states that "[m]ultiple attempts have been made to pull trash from Jeffrey Jelinsky's

7   residence: however, activity inside the household has frustrated these attempts."  *Id*.  Agent Hodgdon

8   asserts that even if they were able to conduct trash runs successfully, the results would not likely identify

9   known conspiracy members or fully identify the nature and extent of the illegal activities…"  *Id*.

10

11        The affidavit also indicates that ICE requested wage information for members of the Jelinsky

12   family which revealed that, despite being observed transferring large quantities of money in envelopes

13   and in the open, none of them had reported income as an employee within the State of Nevada for the

14   time period of January 1, 2004, and December 31, 2006.  *Id* at page 34.

15        The agents used a Confidential Informant ("CS-1") who provided information beginning in

16   December 2006.  *Id* at Page 43.  The CS-1 based his information on his personal knowledge, as well as

17   conversations with members and associates of the Jelinsky Group.  (#48-2 at Page 43 and #48-3 at Page

18   34).  The CS-1 informed the agents of (1) the quantity of certain money exchanged between the subjects

19   (Page 29 and Page 34[5]), (2) that Jeffery Jelinsky was concerned that Bank of America had closed his

20   account due to suspected money-laundering activity (page 29), (3) the identity of an individual in New

21   York that conducts business with the Jelinsky Group (page 33), (4) the identity of a New Jersey "known

22   gambler" who Michael Jelinsky called, and that the two conducted illegal gambling business daily (page

23   39), (5) that Poker Palace arranges for the Jelinsky Group to receive "rebates" on every wager placed,

24

25   ───────────────────────────────

26        [5]The second page number refers to the affidavit in support of continuing interception (#48-3) unless stated
    otherwise.

(page 40), (6) the information detailed in sections (D)(84)(b)–(j) of the first affidavit (pages 43-35), and (7) information necessary to further investigate Masesso (page 34 of second affidavit).  *Id.*

The affidavit explained that while the CS-1 provided historical information, (1) he does not know all the details necessary to ensure a successful prosecution, (2) he does not have regular contact with, communicate with, or do business with the Jelinsky brothers, (3) because of this limited relationship, any pretext phone call would seem suspicious, (4) he is not in a position to obtain more information, (5) he is unwilling to wear a recording device or testify for fear of his safety, and (6) he has been unable to identify who Masesso is working for.  *Id* at page 68 and page 34.  This is more than a recitation of the inherent limitations of using a confidential informant, as Agent Hodgdon explained in "case-specific" detail why the CS-1's ability to provide information was limited.  *See Garcia-Villalba,* 585 F.3d at 1229 (holding that an affidavit that is "sufficiently case-specific" and does more than "recite the inherent limitations of using a confidential informant" "pass[ed] muster.").

In addition to those techniques used, Agent Hodgdon includes a list of those alternative investigative procedures not used and why the agents made the decision not to use them.  (#48-2 and #48-3).  Agent Hodgdon states that targets of the investigation would not be willing or motivated to cooperate, as they appear to derive their livelihood from the operation and spend at least forty (40) hours a week at the Palms Casino or Poker Palace.  *Id* at Page 69 and Page 35.  Agent Hodgdon also states that approaching any of the members of the Jelinsky Group would place the investigation in jeopardy of becoming overt, prior to obtaining the evidence needed."  *Id; See Garcia-Villalba*, 585 F.3d at 1229 (finding adequate an affidavit that explained that interviews would "effectively terminate the investigation without achieving the objective of identifying and obtaining evidence against, other participants," and that interviews and other tactics would "cause members…to flee and to destroy evidence.").

Agent Hodgdon also states that due to the "close knit nature of the individuals in the operation, the opportunity to introduce an undercover agent is extremely unlikely and could interfere with the

covert nature of the investigation thusfar." *Id* at Page 69 and Page 35; *See Garcia-Villalba,* 585 F.3d at 1231 (holding that since "[f]ederal agents would have had difficulty infiltrating the group because of the [subjects' organizations]'s close knit nature," a wiretap was appropriate.)(internal quotations omitted). The agent asserts that an undercover agent would also "cast suspicion upon, and consequently endanger, any informant who might attempt to introduce into the organization an outsider," and that "it would be extremely difficult, and dangerous, to attempt to penetrate the organization with an undercover agent." *Id.*

The affidavit states that Federal Grand Jury subpoenas would "probably not be successful in achieving the goals of the investigation because subjects of the investigation, should they be called to testify, would most likely invoke their Fifth Amendment privileges and refuse to testify." *Id* at Page 70 and Page 37. Agent Hodgdon states that if the subjects were alerted to government scrutiny, the "subjects would temporarily cease operations or take other protective measures," such as flee, destroy evidence, or "otherwise affect the government's investigation." *Id* at Page 70-71 and Pages 37-38; *See Garcia-Villalba*, 585 F.3d at 1229 (finding adequate an affidavit that explained that issuing grand jury subpoenas would "effectively terminate the investigation without achieving the objective of identifying and obtaining evidence against, other participants," and that the subpoenas and other tactics would "cause members…to flee and to destroy evidence.").

The affidavit further explains that subpoenas to bettors and/or clients would not likely yield the discovery of critical information, and that issuing a subpoena to IRG would likely alert members of the organization, because IRG's manager is conspiring with the Jelinsky Group as well. *Id.* Agent Hodgdon also addresses the use of search warrants, and asserts that applications for search warrants are premature at this time, as the agents do not know where the subjects conduct their meetings, direct their gambling activities, or keep their records of the bookmaking operation. *Id* at Page 72 and Page 38. He also states that the agents run the risk of missing critical information and/or alerting the subjects of the investigation to the investigation, causing them to alter their routines and destroy evidence. *Id;*

*Garcia-Villalba*, 585 F.3d at 1229 (holding that an affidavit that states that search warrants would cause subjects to destroy evidence is sufficient).  Agent Hodgdon asserts that searches would not likely uncover the identities of the members, the nature of the illegal activities, or the extent of the activities. *Id.*

The court finds that the affidavits (#48-2 and #48-3) contain full and complete statements demonstrating in "case specific detail" that the agents exhausted several other investigative procedures before seeking the wiretap, the availability of alternative investigative techniques and how "they reasonably appear to be unlikely to succeed if tried or to be too dangerous," and that the wiretap was necessary.  18 U.S.C. § 2518(3)(c); *United States v. Rivera*, 527 F.3d 891, 900 (9th Cir. 2008)(requiring the affidavit to explain in "case specific detail."); *McQuire*, 307 F.3d at 1196—97 (9th Cir. 2002)(holding that while "the wiretap should not ordinarily be the initial step in the investigation,…law enforcement officials need not exhaust every conceivable alternative before obtaining a wiretap.").

The court also finds that, as evidenced by the summary above, the agents used other investigative procedures that provided *some* information, but that the procedures did not provide the agents with sufficient evidence needed.  As the court held in *United States v. Decoud*, 456 F.3d 996, 1007 (9th Cir. 2006) "[t]he necessity requirement is evaluated in light of the government's need not merely to collect some evidence, but to develop an effective case against those individuals in the conspiracy."  The court in *Garcia-Villalba*, went on to state that "[a]n 'effective case' means 'evidence of guilt beyond a reasonable doubt, not merely evidence sufficient to secure an indictment."  *Garcia-Villalba*, 585 F.3d at 1228 (*quoting McQuire*, 307 F.3d 1198).

### 2. Material Misstatements and Omissions

Under *United States v. Fernandez*, 388 F.3d 1199, 1235 (9th Cir. 2004), the  burden shifts to the defendant to prove that a misstatement or omission in the affidavit was (1) material and (2) undermined the Judge's finding probable cause.

### a. Arguments/Discussion

Defendant Pecchio asserts that "when a wiretap application contains material misstatements and omissions that conceal the fact that the necessity has not been shown, the application must be purged of the misstatements." (#48) (citing *Blackmon*, 273 F.3d at 1211). The defendant argues that "the Government agent avers that one of the subjects, 'Louis J. Tavano's father, Lewis C. Tavano, reportedly was an associate of the Todaro (Buffalo) Family of La Costra Nostra'." *Id.* (citing Affidavit in Support of Application Exhibit 2)." Defendant further argues that "[t]his type of inference is added to season the affidavit to support a finding of a criminal conspiracy when in fact there is no allegation in the indictment that [d]efendant is a member of any type of organized crime." *Id.* The government did not address this issue in its opposition. (#49).

During the hearing, defense counsel stated that defendant was not alleging that the affidavit contained a material misrepresentation. (#68). As defendant does not argue that the affidavit contains material misrepresentations, the court need not address this issue.

### 3. Necessity Requirement with Respect to Each Individual Suspect
### a. Defendant's Argument

Defendant Pecchio asserts that "the government must make this specific showing of necessity every time it seeks a wiretap, and must satisfy the necessity requirement with respect to each individual suspect whose telephone it wishes to tap." (#48). The defendant argues that the government must "demonstrate necessity with respect to the new suspect." *Id.* The defendant also argues that the government "cannot rely on its previous showing that normal investigative techniques failed to yield evidence against initial subjects." *Id.* (See, *Blackmon*, 273 F.3d at 1209 ("It is inadequate simply to carry over statements from prior applications as to other subjects without making further investigative attempts."); *See also, United States v. Carneiro*, 861 F.2d 1171, 1181 (9th Cir. 1988) ("The fact that the government adequately exhausted traditional investigative techniques before seeking an order to tap [a co-conspirator's] telephone is irrelevant.").

The defendant further argues "[i]t is not enough that the agents believe the telephone subscribers they wish to tap are all part of one conspiracy.  Less intrusive investigative procedures may succeed with one putative participant while they may not succeed with another." *Id.* (*citing Abascal*, 564 F.2d 821, 826 (9th Cir. 1977) ; *see also, Carneiro*, 861 F.2d at 1181 ("A suspicion that a person is a member of a conspiracy … is not enough to obtain a wiretap.")).  The government does not specifically address the defendant's arguments on this issue.  (#49).

### b. Discussion

Defendant Pecchio argues that the government must satisfy the necessity requirement with respect to each individual suspect whose telephone it wishes to tap.  (#48).  The court notes that the affidavit (#48-2) and the affidavit in support of continuing interception (#48-3) were for the interception of wire communications on telephone numbers known to be used by Michael Jelinsky (subscribed to by Barbara Jelinksy), Jeffrey Jelinsky (prepaid cellular phone numbers), and Nicholas Masesso (subscribed to Meadows Office Furniture), not Pecchio.  The *Blackmon* case cited by the defendant is distinguishable from the instant case in this respect, as that case involved the use of a previously submitted affidavit to support the authorization of a wiretap of a different *suspect's phone*.  *See Blackmon*, 273 F.3d 1204, 1208 (9th Cir. 2001)(holding that the second affidavit was a "carbon copy" of a previous application for a different suspect that contained statements applicable to the first subject but not the defendant).  The *Carneiro*, case is also distinguishable, as the court the district court had lumped the four separate affidavits together to find necessity, and the Ninth Circuit found that three of the four wiretap affidavits did not "contain sufficient facts to satisfy the necessity requirement" when looked at independently, and contained "misstatements and omissions regarding the necessity for the wiretaps."  *Caeneiro*, 861 F.2d 1177.

In *Abascal*, the court stated that "[i]t is not enough that the agents believe the telephone subscribers they wish to tap are all part of one conspiracy," and that "[l]ess intrusive investigative procedures may succeed with one putative participant while they may not succeed with another."

*Abascal*, 564 F.2d at 826.  The court ultimately held that the supporting affidavits were sufficient to justify the second tap, as the agents had conducted investigations relating to the second subject and not just relied on the allegation that they were part of the same conspiracy.  *Id.*  Here, the affidavits state the subjects who regularly use the telephones and how alternative investigative procedures have been tried and did not work or were not tried due to danger or fear of hindering the investigation.  (#48-2 and #48-3).  The affidavit in support of the continuing interception added a new telephone number that was used by Nicholas Masesso, and subscribed to by Meadows Office.  (#48-3).  The agent did not rely on the necessity requirement found in the original affidavit  (#48-2), and provided the court with a separately sufficient affidavit (#48-3).

The second affidavit specifically states that, according to a confidential source, Masesso allegedly is a member of the Jelinsky Group who "is assisting them in establishing offshore betting accounts where they can layoff some of their action."  (#48-3 at Page 11).  The affidavit also indicates that intercepted conversations discussed Masesso "taking shylock money (money owed to a loan shark) from Jeff and using it for himself," and that the agent believed, based on information from c confidential source, that Jeffrey Jelinsky owed a New York family a large gambling debt and that Masesso was collecting money for the New York family.  *Id* at Page 12-13.  The affidavit also states that other phone calls were placed by Jeffrey Jelinsky to Masesso (1) regarding a loan shark and losing money to a cash guy (referring to a bettor number 1202)(supporting the belief that Masesso was collecting money owed to the New York family), (2) regarding bettor 1202 coming in to place wagers and the amount of the bets (supporting the belief that Masesso and Jelinsky were bookmaking partners), (3) regarding horse races that ran the day before and an old client in the betting business, (4) regarding bettor 1202 and what he be that day, (5)  regarding going to Poker Palace and that Masesso would receive $15,000 towards the "shy" if he "hit," and (6) regarding Masesso arranging to meet up with Jelinsky and what bettor 1202 bet on that day.  *Id* at Pages 11-24.

The affidavit also contains the pen register analysis for target telephone number 4, used by Masesso. *Id* at Page 25-27. This demonstrates that the agents used pen registers for Masesso's phone before seeking the wiretap. The affidavit also includes the text messages from target telephone number 1 between Michael Jelinsky and Masesso regarding quinellas, how the bets were doing, races in general, and that they could not win in California anymore. *Id* at Page 29. In paragraph (62) of the affidavit, the agent states why it is necessary to intercept phone calls on Masesso's phone, and asserts that (1) intercepted calls and pen registers indicate that Masesso is a money collector, (2) that the interceptions will reveals who Masesso is working for and what his business relationship is with the Jelinsky Group, (3) that it is believed that Masesso is helping establish offshore accounts for the Jelinsky Group, and (4) that interceptions will reveal Masesso's contacts at the offshore race books and the organized crime members responsible for operating these facilities. *Id* at Page 33.

The affidavit includes reasons why normal investigative techniques have been tried without success, reasonably appear unlikely to succeed if continued, reasonably appear unlikely to succeed if tried, or are too dangerous to employ with regard to the Jelinksy brothers *and* Masesso, including the CS-1, trying to get subjects to cooperate, an undercover agent, the "extensive physical surveillance," Federal Grand Jury subpoenas, search warrants, interviews, trash covers, and the analysis of toll records and the use of pen register devices. *Id* at Page 34-40. The court finds that these reasons satisfy the necessity requirements under 18 U.S.C. § 2518. As in *Abascal*, 564 F.2d at 826, the agents investigated Masesso before seeking the wiretap and adequately explained the necessity of the wiretap with regard to Masesso, without relying only on the fact that he was a part of the alleged conspiracy.

### 4. Abuse of Discretion in Finding Necessity

The defendant argues that several investigative methods employed by Special Agent Hodgdon and NGCB agents rendered the wiretaps unnecessary. (#48). The government argues that Special Agent Hodgdon explained the limitations and inadequacies of other investigative methods. (#49). The government further argues that the defendant disregards "the maxim that 'law enforcement officials need

not exhaust every conceivable alternative before obtaining a wiretap.'" *Id* (quoting *McGuire*, 307 F.3d at 1196-97).

"Employing a 'common sense' approach," the court must evaluate "the reasonableness of the government's good faith efforts to use traditional investigative tactics or its decision to forego such tactics based on the unlikelihood of their success or the probable risk of danger involved with their use." *Garcia-Villalba*, 585 F.3d at 1230 (quoting *Gonzaes Inc.*, 412 F.3d at 1112). As the court in *McQuire* held, "the government is entitled to more leeway in its investigative methods when it pursues a conspiracy." *McQuire*, 307 F.3d at 1198. The parties' specific arguments regarding each investigative method are as follows:

### • Confidential Informants
#### a. Defendant's Argument

Defendant Pecchio argues that the affiant does not explain "whether there are other confidential informants that have been contacted, or whether there are other individuals that the Affiant or other law enforcement official have identified or contacted to determine if they might be viable source of information." (#48). Defendant further argues that the gaming activities were "open and obvious" to the operational and managerial levels of the Palms Hotel and Casino. *Id.* The defendant asserts that there has been no discovery presented as to whether the confidential source wore a wire to record his meetings with the subjects. *Id.* Defendant also argues that a cooperation deal could have been reached with the Palms Employees Defendants that were involved in the conspiracy, which would eliminate the necessity to use a Title III wiretap. *Id.*

#### b. Government's Argument

The government argues that the affiant disclosed that a confidential informant had been used and that she provided a "comprehensive summary of information obtained from the source." (#49). The government further argues that the affiant explained the confidential informant's relationship to the

Jelinskys and how the informant was unable to provide information related to the scope and inner-working of the conspiracy. *Id.*

The government analogizes this case to *United States v. Rivera*, 527 F.3d 891 (9th Cir. 2008), where the court found "the affidavit here did more than recite the inherent limitations of using confidential informants; it explained in reasonable detail why each confidential source or source of information was unable or unlikely to succeed in achieving the goals of the ... investigation." *Id.* (quoting *Rivera*, 527 F.3d at 899). The government also argues that "the hypothetical possibility that participants in a criminal conspiracy might cooperate with law enforcement is not sufficient to shield a conspiracy from electronic surveillance under Title III. *Id.*

### c. Discussion

The court agrees with the government, and finds that the affidavits adequately explains the necessity of the wiretap in light of the current CS-1 and the impossibility of other informants. (#48-2 and #48-3). Agent Hodgdon explained that members of the conspiracy would not be likely to cooperate with the agents (page 69 and page 35[6]), that the CS-1 was not willing to wear a recording device (page 68 and page 35), that the CS-1 had a limited relationship with the subjects (page 68 and page 34), and how granting immunity to subjects (cooperation deal) would "foreclose the possible prosecution of the most culpable persons, and would thwart the public policy that they be held accountable for their illegal activities" (page 71 and page 37). *Id.*

As discussed above, the court finds that the affidavits (#48-2 and #48-3) adequately explain how the use of a confidential informant was not sufficient, by explaining the information obtained from the CS-1, the CS-1's relationship with the subjects, the CS-1's unwillingness to participate further, and the limitations of the CS-1, in "case specific" "reasonable detail." *See Garcia-Villalba*, 585 F.3d 1229. The

---

[6] The second page number in this section refers to the affidavit in support of the continuing interception. (#48-3).

1    court finds that this demonstrates the government's "good faith effort to use a confidential informant

2    before applying for a wire taps.  *Id* at 1230 (quoting *Gonzalez, Inc*., 412 F.3d at 1112).

3                                    • **Physical Surveillance**

4                                       **a. Arguments**

5            The defendant argues that while the affidavit states that the "agents attempted to utilize physical

6    surveillance but 'Jeffrey Jelinsky drives erratically, running through red lights, turning without signaling

7    and making rapid directional changes'(Exhibit 3, paragraph 63(d)), the affidavit is chalked full of

8    surveillance of all the subjects inside the Palms sportsbook throughout their investigation underlining

9    the fact that a wiretap was not necessary." (#48).

10

11           The government argues that the defendant ignores the affiant's observations that the physical

12   surveillance has been useful in "verifying information discussed over the telephone" and "placing

13   individuals together" but it "provided little information regarding the purpose of their meetings or the

14   content of their conversations." (#48).  The government further argues that the affidavit, when read in

15   its entirety, establishes that "physical surveillance alone was inadequate to accomplish the goals of the

16   investigation." *Id.*

17                                     **b. Discussion**

18

19           The court finds that the affidavits demonstrate the necessity of the wiretap in light of the

20   limitations of physical surveillance. (#48-2 and #48-3).  As discussed above, Agent Hodgdon states in

21   the initial affidavit that the use of physical surveillance (1) was useful in placing the individuals

22   together, but provided little information regarding the "purpose of their meetings and the content of their

23   conversations" (page 69), (2) provided only limited evidence and has been "met with only limited

24   success because the Subjects are extremely surveillance conscious" (page 69), and (3) helped establish

25   the main targets of the operation, but not the roles of the individuals, something that a wiretap could

26   accomplish without fear of discovery (page 70).  (#48-2).  Agent asserts that the wiretap could also

provide the agents with knowledge of the location of physical evidence and/or the location of a meeting, without the risk of discovery inherent in following the subjects or remaining in the vicinity for too long. *Id.*

The second affidavit states that the use of physical surveillance (1) was useful in placing the individuals together, but provided little information regarding the "purpose of their meetings and the content of their conversations" (page 36), Jeffrey Jelinsky drives erratically making it difficult to maintain effective surveillance (page 36), and that the interception of wire communications have helped and will continue to help the agents establish when a meeting will take place and set up physical surveillance in advance, thereby minimizing the risk of discovery inherent in following or remaining in the vicinity too long (page 36). (#48-3).

The court in *Garcia-Villalba* held that there was a need for a wiretap where, as here, continuing physical surveillance would not allow the agents to "identify the role of all participants in [the] offenses," and could alert the subjects to the investigation and sabotage investigation efforts. *Garcia-Villalba*, 585 F.3d at 1231. In addition to explaining the limits of the physical surveillance, the affidavit included an explanation of how the wiretap would assist and were assisting the agents in their investigation in a way that the physical surveillance could not. (#48-2 and #48-3). The court finds that the government acted in "good faith" in its decision that physical surveillance was not sufficient. *Gonzalez, Inc.*, 412 F.3d at 1112.

• **Trash Searches**

**a. Argument**

Defendant Pecchio asserts that "Agents searched trash containers at the Subjects residences and in trash bins located at the Palms." (#48). Defendant further asserts that on "January 26, 2007, NGCB agents conducted a "trash cover" at two residences. (Exhibit 3, paragraph 66)" and on "February 2 & 18, 2007, NGCB and ICE agents recovered trash from the back row of the Palms Casino and found a stack of racing forms. (Exhibit 3, paragraph 67-68)." *Id.* Defendant does not make specific arguments

that the wiretap was unnecessary in light of the trash covers.  *Id.*  The government asserts that "the fact that law enforcement agents were sifting through the trash of the subjects of the investigation did no obviate the need for interception of wire communications pertaining to the subjects criminal activities. (#49).

### b. Discussion

The court finds that the lack of critical evidence uncovered during the trash covers, as stated in the affidavits (#48-2 and #48-3), supports a finding that the wiretap was necessary.  The affidavits state that the trash covers "produced limited results," were for the most part "unsuccessful" as far as the residences, and, even if they were successful in the future, "would not likely identify known conspiracy members or fully identify the nature and extent of the illegal activities of the subjects."  *Id* at page 73 and page 39-40.  The second affidavit explains that Masesso lives in a high-rise condominium, making attempts to locate trash almost impossible.  (#48-3 at Page 39)  As the court held in *Garcia-Villalba*, 585 F.3d at 1231, an affidavit that demonstrates the "government's desire to identify the 'role of all participants in [the] offenses" and inability to do so by traditional investigative methods is sufficient to support a finding that the government made a "good faith" decision that a tactic, such as trash covers, were unsuccessful.

### • Financial Investigation

### a. Arguments

The defendant asserts that the "affiant refers throughout both Exhibit 2 & 3 [to] the extensive financial records retrieved from the different wire transfers." (#48).  He argues that the evidence shows millions of dollars were transferred by the subjects, which made the wiretap unnecessary for the government.  *Id.*  The government asserts that the defendant's logic regarding the "frequency and quantity of monetary transfers" is illusive. (#49).  The government argues that the "financial records were not dispositive and did not alleviate the need for intercepts of pertinent wire communications." *Id.*

### b. Discussion

The court finds that the agent's investigation of the subjects' financial records demonstrates that the agents made  "good faith" effort to employ other investigative tactics before applying for the wiretap, and that under a "common sense approach," the existence of large deposits or transactions alone does not provide the government with the ability to develop an "effective case" against the defendants. *See Garcia-Villalba*, 585 F.3d at 1230; *Decoud*, 456 F.3d at 1007.

### • Grand Jury Subpoenas

### a. Defendant's Argument

Defendant asserts that although the affiant claims (in the continued interception affidavit) that "grand jury subpoenas would 'probably not be successful in achieving the goals of this investigation because subjects of the investigation would invoke the Fifth Amendment'" privilege, the "affiant made no attempt at issuing subpoenas in hopes of receiving cooperation unbuckling the need for a wiretap." (#48)(citing Exhibit 3, paragraph 63(e)).

### b. Government's Argument

The government asserts that the affiant reasonably concluded that the subpoenas would have little success because the subjects would likely assert their Fifth Amendment rights.  (#49).  The government also asserts that any such subpoena would have "thwarted the investigation by alerting the subjects to law enforcement agents' interest in their criminal activities."  *Id.*  The government states, "[u]nfortunately —if not ironically—defendant has shown no inclination to accept responsibility and to cooperate with law enforcement."  *Id.*

### c. Discussion

The court finds that the affidavits support a finding that the government made a "good faith" decision not to issue grand jury subpoenas for fear that the subpoenas would (1) alert the subjects to the investigation, (2) be futile because the subjects would plead the Fifth, (3) not elicit critical information

29

if served on betters and/or clients, and (4) thwart the investigation by causing the subjects to flee, destroy evidence, or cease the activity.  (#48-2 at pages 70-71 and #48-3 at page 37-38).  The Ninth Circuit has recognized that when an affidavit demonstrates that alternative investigative measures, such as grand jury subpoenas, would alert the subjects and possibly result in the sabotage of the investigation, the government has shown a need for the wiretap.  *Garcia-Villalba*, 585 F.3d at 1231.

• **Search Warrants**

**a. Arguments**

The defendant argues that the government agents did not meet the necessity requirement of the application, as the affiant "failed to search any of the residences prior to the application" because the affiant claimed that search warrants would "lead to alerting the subjects."  (#48).

The government argues that the affiant explained that law enforcement considered seeking a search warrant but concluded that "such a course would be premature as law enforcement had been unable to identify where the Jelinksys maintained records of their suspected gambling business." (#49). The government further argues that search warrants would not have "identified all of the members of the conspiracy and the nature and scope of their crimes." *Id.*  The government asserts that a "premature search could have thwarted the investigation by alerting the subjects to its existence." *Id.*

**b. Discussion**

The court finds that, taking a "common sense" approach in determining the reasonableness of the government's "good faith" efforts, the affidavit sufficiently describes why the agents did not use search warrants due to the fact that (1) they did not know where the critical evidence would be found at certain stages in the investigation, (2) executing the warrants would alert the subjects to the investigation, causing destruction of evidence, fleeing, or ceasing of activity, and (3) the searches would not yield the identities of the conspiracy members, the nature of the conspiracy, or the extend of the illegal activity.  (#48-2 at pages 71-72 and #48-3 at page 38).

As discussed above, the Ninth Circuit has held that alternative investigatory means that "possibly sabotage[] the investigation," would "alert[] the defendants to the investigation," and do not fulfill the government's "desire to identify the 'role of all participants in [the] offense'" support a finding of necessity for a wiretap. *Garcia-Villalba*, 585 F.3d at 1231.

For the reasons stated above, the court finds that the District Judge properly found that the wiretap was necessary.

### B. Judge Hunt's Findings of Probable Cause

#### 1.      Arguments

In the motion to suppress, the defendant asserts that the conclusion that the facts contained in the Affidavits demonstrate that "there was probable cause to believe that the Target Subjects and others had committed and were about to commit offenses enumerated Title 18 U.S.C. Section 2516, is fatally flawed in that the Affidavits in support of the all of the Governments' Applications in this case lack[s] probable cause, as the[] affidavits lack foundation therefore (sic), the opinions of the meaning of the "coded" language should not have been considered by the Court in determining whether the interception of wire communications should have been approved. The lack of foundation is a fatal flaw." (#48). The defendant did not present any arguments or case law to support this assertion in his motion. *Id.*

In response to the defendant's argument, the government argues that the supporting affidavits provide summaries of facts and circumstances, which supported Judge Hunt's finding of probable cause. (#49). The government generally argues about investigative methods used, but does not specifically address defendant's arguments about "coded language." *Id.* The government further argues that Judge Hunt's findings "are entitled considerable weight and should not be disturbed absent a showing of substantial error." *Id* (citing *United States v. Lynch*, 437 F.3d 902, 912 (9th Cir. 2006) ("This court's review of a finding of probable cause is deferential."). *Id.*

. . .

## 2.      Discussion

Section 2518(3) allows entry of a wiretap order if the issuing judge determines: (a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in [18 U.S.C. § 2516]; (b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;... (d) except as provided in [§ 2518(11) ], there is probable cause for belief that the facilities from which, or the place where, the wire, oral or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

The court finds that the affidavits (#48-2 and #48-3) in support of the applications for the wiretap and continuing wiretap  contain sufficient factual allegations, based on physical surveillance, information obtained from a confidential informant and other witnesses, trash searches, hotel room searches, financial searches, independent investigations, records obtained from telephone companies, account verifications from financial institutions, and pen registers and trap- and-trace devices, demonstrating that the subjects were conspiring together to commit and did commit several criminal acts relating to their gambling at the Palms Casino and Poker Palace.  This provided the District Judge with a foundation upon which to base his conclusion that there was probable cause to believe that the subjects were engaged in illegal activity.  *See* 18 U.S.C. § 2518(3)(a).  Defendant Pecchio admits that the "lengthy affidavit is chalked full of specific details" relating to the investigation (#48), and cannot argue to the court that the District Judge erred in finding that probable cause existed.

The seventy-seven (77) page affidavit and fifty-two (52) page affidavit in support of continuing interception are very thorough, and contain the following: lists of the offenses allegedly committed by the subjects (#48-2 at Page 3 and 4 and #48-3 at Pages 3-5), the subjects and any prior criminal history (#48-2 at Page 7-9 and #48-3 at Pages 7-9), what the wire communications are expected to reveal (#48-2 at Pages 9 and 10), the facts and circumstances (#48-3 at Pages 9 and 10), the basis for probable cause

(#48-2 at Page 12), an overview of the evidence and information obtained (#48-2 at Pages 13-19), a lengthy background of the investigation (#48-2 at Pages 19-41), what information was learned from the confidential informant (#48-2 at Pages 42-45), the connection to the IRG/Youbet.com (#48-2 at Pages 45-52), pen register analysis of the target telephones (#48-2 at Pages 53-68 and #48-3 at Pages 35-37), use of the target telephones (#48-3 Pages 11-34), use of text messaging on the target telephones (#48-3 at Pages 38-39), and the need for interception (#48-3 39-50).

The affidavits explain in great detail what telephones were used, who used those telephones, who the telephones were registered to, who was witnessed answering the telephones when the agents made pretext calls, information obtained from wireless companies regarding the telephones, what conversations were overheard regarding the illegal activity, the activities surrounding phone calls made and received, numbers dialed from public telephones to race betting companies, the amount of phone calls made and received by numbers used by the subjects, the length of the phone calls, and how the subjects' physical conduct and telephone use was consistent with illegal betting. *See generally* (#48-2 and #48-3). This provided the District Judge with an adequate foundation upon which to base his finding that probable cause existed that the subjects used the target telephones in furtherance of the crimes and that the target telephones were either registered to the subjects or commonly used by them. *See* 18 U.S.C. § 2518(3)(b) and (d).

**RECOMMENDATION**

Based on the foregoing, it is the recommendation of the undersigned United States Magistrate Judge that Defendant Pecchio's Motion to Suppress (#48) should be DENIED.

**NOTICE**

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also

held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 3rd day of June, 2013.

_____

CAM FERENBACH

UNITED STATES MAGISTRATE JUDGE